THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY

| | | |
|---|---|---|
| DANIEL WALTERS and MARIA WALTERS, | : | HON. JEROME B. SIMANDLE |
| | : | Civil No. 06-1228 (JBS) |
| Plaintiffs, | : | |
| v. | : | **OPINION** |
| GEORGE LITTLE MANAGEMENT, LLC et al., | : | |
| Defendants. | : | |

APPEARANCES:

Frank D. Allen, Esq.
Rebecca Lynne Rakoski, Esq.
ARCHER & GREINER, PC
One Centennial Square
Haddonfield, NJ 08033
        Attorneys for Plaintiffs

Edward H. Keiper, Esq.
Fairway Corporate Center II
4350 Haddonfield Road
Suite 210
Pennsauken, NJ 08109
        Attorney for Defendant and Third Party Plaintiff George
        Little Management, LLC

John Ralph Holsinger, Esq.
Two University Plaza
Suite 300
Hackensack, NJ 07601
        Attorney for Defendant Freeman Decorating Services, Inc.

Michael C. Salvo, Esq.
AHMUTY, DEMERS & MCMANUS, ESQS.
65 Madison Avenue
Suite 100
Morristown, NJ 07960
        Attorney for Defendant and Third Party Defendant Fruits &
        Passion

**SIMANDLE,** District Judge:

This action centers around an accident that took place at the Jacob K. Javits Convention Center ("Javits Center") in New York City during a trade show in April 2005.  Plaintiff Daniel Walters was attending the show at the Javits Center when his pant leg got caught on Defendant Fruits & Passion's display booth at the show, causing him to fall and sustain injuries.  The instant lawsuit ensued, with Plaintiff filing suit against Defendants in the Superior Court of New Jersey and Defendant George Little Management, LLC ("GLM") removing the action to this Court.

Presently before the Court are the motions of Defendants Freeman Decorating Services, Inc. ("Freeman") and GLM for summary judgment [Docket Items 44 and 45].  For the reasons explained below, the Court will grant Freeman's motion for summary judgment in its entirety, and will grant GLM's motion for summary judgment as to Plaintiffs' claims against it.  The Court will dismiss as moot GLM's motion for summary judgment on its claim for indemnification from Freeman.

I.    **BACKGROUND**

A.    **The April 10, 2005 Incident**

The New York Home Textiles Show ("NYHTS"), a trade show that bills itself as "America's premier bed, bath, linen, [and] home accessories show," was held at the Javits Center between April 8 and April 11, 2005.  (Def. Freeman's Br. Ex. 4 1) (internal

2

capitalization omitted).  As the Court explains in greater detail, _infra_, Defendant Fruits & Passion ("F&P") was one of many exhibitors with booths and displays at the 2005 NYHTS.  (Am. Compl. ¶ 4.)  Plaintiffs Daniel and Maria Walters, who are husband and wife and were married when the incident underlying this litigation took place, visited the Javits Center to attend the NYHTS on April 10, 2005.  (_Id._ at ¶¶ 5, 11.)

At approximately 2:00 p.m. on the afternoon of April 10, 2005, Plaintiffs were walking down one of the aisles of exhibitor booths at the NYHTS.  (_Id._ at ¶ 5.)  As Plaintiffs reached the corner at which F&P's display booth was located, Mr. Walters began turning to the left when the leg or cuff of his trousers allegedly got caught on the metal trim on the bottom of the F&P booth.  (_Id._; Def. GLM's Br. Ex. C at 34.)  Mr. Walters attempted to pull his leg to disentangle his pants from the metal trim, and he fell.  (Def. GLM's Br. Ex. C at 36.)  According to Mrs. Walters, after he husband fell, she approached him on the floor and noticed that a two-foot piece of metal trim from the F&P booth had been bent out of its position such that it was "perpendicular to the platform."  (Def. Freeman's Br. Ex. 16 at 27.)  Neither Plaintiff observed that the metal trim was bent out of place prior to Mr. Walters' fall, (_id._; Def. GLM's Br. Ex. C at 97), and one of F&P's employees who witnessed the fall

observed that "[b]efore he fell[, the metal trim] was flush, it was not dislodged."  (Def. Freeman's Br. Ex. 12 at 33.)

At some point after Mr. Walters' fall, paramedics arrived to attend to his injuries.  (Pls.' Opp'n Br. Ex. 6 at 37.)  As the paramedics were caring for her husband, Mrs. Walters examined the metal trim on F&P's booth and noticed that there were two empty screw holes close to where the piece of metal had bent.  (Id.) Mrs. Walters got down on her hands and knees and searched for the missing screws but never found them.  (Id. at 37-38.)  As a result of his fall, Mr. Walters alleges that he suffered "serious and significant personal injuries[,] some of which are permanent in nature."  (Am. Compl. ¶ 8.)

**B.    The Parties and their Contractual Arrangements**

The NYHTS event was organized and sponsored by GLM, and was held at the Javits Center pursuant to a license agreement between GLM and the New York Convention Center Operating Corporation ("NYCCOC"), the organization responsible for operating the Center.[1]  (Def. Freeman's Br. Ex. 1.)  As the sponsor and organizer of the NYHTS, GLM's responsibilities included an

---

[1]   The NYCCOC is a statutorily created public benefit corporation charged with operating and maintaining the Javits Center.  See NY Pub. Auth. § 2561.  The New York Convention Center Development Corporation, which Plaintiffs sued initially but voluntarily dismissed [Docket Item 23], is a "subsidiary of the New York Urban Development Corporation[, and] was created to facilitate the construction of [the Javits Center]."  L.K. Comstock & Co., Inc. v. New York Convention Center Development Corp., 179 A.D. 2d 322, 324 (N.Y.A.D. 1st Dept. 1992).

organizational phase and a "show phase."  (Pls.' Opp'n Br. Ex. 13.)  In its organizational role, GLM entered into the license agreement with the NYCCOC, sold vendor space at the show to exhibitors, and promoted the show to visitors.  (Def. Freeman's Br. Ex. 1; Pls.' Opp'n Br. Ex. 11.)  GLM's responsibility during the show phase was, in essence, to make sure that the show went "smoothly," (Pls.' Opp'n Br. Ex. 13), a role that included having GLM staff "walk[ing] up and down the aisles" during the show, (Pls.' Opp'n Br. Ex. 14), and dispatching GLM floor managers and other personnel to address problems as they arose.  (Pls.' Opp'n Br. Ex. 13.)

According to the "Work Rules" section of the NYCCOC-GLM license agreement, exhibitors at the NYHTS were required to use the Javits Center's own laborers to perform a variety of tasks related to the event, including building and dismantling exhibits and booths, although exhibitors could elect to supervise the work of the Javits laborers themselves.  (Id. at 12.)  GLM hired Freeman to serve as the "service contractor" for the NYHTS, (Def. Freeman's Br. Ex. 14 at 10), which meant, inter alia, that an exhibitor seeking to hire Javits Center laborers would place a laborer request with Freeman, and "Freeman would act as a conduit between the Javits Center and the exhibitor" by dispatching the laborers and billing the exhibitor on the Javits Center's behalf. (Def. Freeman's Br. Ex. 15 at 27.)  Freeman's responsibilities as

the service contractor for the NYHTS also included unloading the
exhibitors' materials that were shipped to the Javits Center,
(Pls.' Opp'n Br. Ex. 15), and working with GLM to design the
physical layout of the show.  (Pls.' Opp'n Br. Ex. 16.)  The
contract between Freeman and GLM required Freeman to carry
"commercial general liability insurance . . . to protect itself
from any claims arising from its operations on behalf of [GLM],"
(the "insurance clause")[2] and included an indemnification clause
whereby Freeman agreed to indemnify GLM for claims arising out of
Freeman's work for GLM "except for occurrences or accidents
caused by the sole negligence of [GLM] . . . or for that portion
of any occurrence or accident caused by any other party" (the
"indemnity clause").[3]  (Def. GLM's Br. Ex. E.)

---

[2]  The GLM-Freeman insurance clause provides:

[Freeman] will carry commercial general liability
insurance, including auto liability and workers'
compensation insurance to protect itself from any claims
arising from its operations on behalf of [GLM],
immediately prior to, during and immediately following
the [NYHTS]. Such commercial general liability insurance
shall name [GLM] as additional insured with respect to
such coverage and shall be primary and noncontributory to
any insurance carried by [GLM] which shall be in excess
to the Freeman insurance.

(Def. GLM's Br. Ex. E.)

[3]  The GLM-Freeman indemnity clause provides:

[Freeman] shall indemnify defend and hold harmless [GLM]
from and against any Bodily Injury or Property Damage
liability claims, judgments, damages, costs or expense,
including reasonable attorneys' fees, arising out of or

F&P was one of the exhibitors with a booth at the NYHTS. (Def. Freeman's Br. Ex. 12 at 35.)  F&P designed its booth, (Def. GLM's Br. Ex. J 14), which was assembled at the NYHTS by two Javits Center laborers whom F&P hired by placing an order with Freeman.  (Def. Freeman's Br. Ex. 12 at 17.)  In its dealings with NYHTS exhibitors, Freeman permitted exhibitors either to hire Freeman to supervise the construction of their booths, in which case Freeman would agree to indemnify the exhibitor from liability for injuries resulting from the supervised construction, or to have the exhibitor itself supervise the construction, in which case the exhibitor would agree to indemnify Freeman from such liability.  (Def. Freeman's Br. Ex. 3 at 2.)  F&P took the second option, supervising the construction of the booth itself and agreeing to indemnify Freeman[4] from

---

occasioned by the operations performed for [GLM] by [Freeman], except for occurrences or accidents caused by the sole negligence of [GLM], or for that portion of any occurrence or accident caused by any other party.

(Def. GLM's Br. Ex. E.)

[4]  The indemnity clause in the Freeman-F&P contract provides:

[F&P] agrees to indemnify, hold harmless, and defend [Freeman] from and against any and all demands, claims, causes of action, fines, penalties, damages, liabilities, judgment, and expenses (including but not limited to reasonable attorneys' fees and investigation costs) for bodily injury, including any injury to [Freeman] employees, and/or property damage arising out of work performed by labor provided by [Freeman] but supervised by [F&P].

liability for injuries resulting from such construction.  (<u>Id</u>; Def. Freeman's Br. Ex. 15 at 32.)

### C.   Procedural History

Plaintiffs filed this action in the Superior Court of New Jersey on January 27, 2006, naming as defendants GLM; Friends of Jacob K. Javits Convention Center, Inc.; Jacob K. Javits Foundation, Inc.; the New York Convention Center Development Corporation ("NYCCDC"); the NYCCOC; and Freeman [Docket Item 1]. Plaintiffs' Complaint alleged that Mr. Walters was injured as a result of the defendants' negligence, and also asserted a claim for Mrs. Walters' loss of consortium.  GLM timely filed a notice of removal to this Court, invoking the Court's diversity jurisdiction under 28 U.S.C. § 1332 [<u>id.</u>].  GLM subsequently filed a Third-Party Complaint against F&P [Docket Item 5], and on August 15, 2006, Plaintiffs filed an Amended Complaint naming F&P as a direct defendant [Docket Item 19].[5]  After filing their Amended Complaint, Plaintiffs filed a stipulation dismissing with prejudice Defendants NYCCDC and NYCCOC [Docket Item 23]. Discovery was completed and Defendants GLM and Freeman

--------

(Def. Freeman's Br. Ex. 3 at 2.)

[5]  The Amended Complaint asserts the same claims as the original Complaint – Mr. Walters' negligence claim and Mrs. Walters' loss of consortium claim.

subsequently filed the motions for summary judgment presently under consideration, to which the Court now turns.

## II.  DISCUSSION

### A.  Subject Matter Jurisdiction

GLM removed this case to this Court pursuant to 28 U.S.C. § 1441(a), which grants "a defendant . . . the right to remove a civil action from state court if the case could have been brought originally in federal court."  In re Briscoe, 448 F.3d 201, 215 (3d Cir. 2006).  As GLM reasoned in its notice of removal [Docket Item 1], this Court has jurisdiction over this diversity action under 28 U.S.C. § 1332, which provides for the original jurisdiction of United States district courts over "civil actions where the matter in controversy exceeds the sum or value of $75,000, exclusive of interest and costs, and is between . . . citizens of different States."  No party has contested GLM's assertion in its notice of removal that the matter in controversy here exceeds $75,000, and there is complete diversity between the parties in this action.  In re Briscoe, 448 F.3d at 215.

### B.  Standard of Review

Summary judgment is appropriate when the materials of record "show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c).  A dispute is "genuine" if "the evidence is such that a reasonable jury could return a verdict

for the non-moving party."  See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  A fact is "material" only if it might affect the outcome of the suit under the applicable rule of law. Id.  In deciding whether there is a disputed issue of material fact, the court must view the evidence in favor of the non-moving party by extending any reasonable favorable inference to that party; in other words, "the nonmoving party's evidence 'is to be believed, and all justifiable inferences are to be drawn in [that party's] favor.'"  Hunt v. Cromartie, 526 U.S. 541, 552 (1999) (quoting Liberty Lobby, 477 U.S. at 255).

**C.   Plaintiffs' Claims Against GLM and Freeman**

Mr. Walters' negligence claim, asserted against all of the defendants, states that Defendants "were contractually or otherwise obligated as a matter of law in the course of its business to maintain the premises in a safe condition for the public," and that "defendants or persons acting as the servants, agents or employees of defendants failed to maintain the premises in a safe manner and/or in fact created a dangerous and hazardous condition," which caused Mr. Walters' injury.  (Am. Compl. ¶¶ 6-7.)  Mrs. Walters claims to have suffered the "loss of consortium, companionship and comfort of her spouse Daniel Walters as well as related losses and damages" as a result of Mr. Walters' injury.  (Id. at ¶ 12.)  For the reasons that follow,

the Court agrees with GLM and Freeman that they are entitled to summary judgment as to both of these claims.

        1.   <u>Choice of Law</u>

With the exception of GLM, the parties largely appear to have assumed that New York law governs the Court's assessment of Mr. Walters' claims against GLM and Freeman without addressing New Jersey's choice of law rules.  In this diversity action, filed in New Jersey but alleging that a wrong occurred in New York, the Court will apply New Jersey's choice of law rules to determine which state's laws govern its analysis of Plaintiffs' claims.  <u>See</u> <u>Berg</u> <u>Chilling Systems, Inc. v. Hull Corp.</u>, 435 F.3d 455, 462 (3d Cir. 2006) (noting that "in an action based on diversity of citizenship jurisdiction, [the District Court] must apply the substantive law of the state in which [it sits], including its choice of law rules").

In evaluating choice of law questions for tort claims, New Jersey courts have abandoned the rigidity of the traditional place-of-the-wrong test in favor of the more flexible governmental interest analysis.  <u>See</u> <u>O'Connor v. Busch Gardens</u>, 255 N.J. Super. 545, 548 (App. Div. 1992).  The governmental interest test entails a two-prong analysis.  First, the Court assesses whether there is an "actual conflict" between the laws of the potentially interested states on the issue in question.  <u>Lebegern v. Forman</u>, 471 F.3d 424, 428 (3d Cir. 2006).  "If there

11

is not an actual conflict, the inquiry is over and, because New Jersey would apply its own law in such a case, a federal court sitting in diversity must do the same." <u>Id.</u>  If, and only if, there is an actual conflict between the potentially applicable laws, then the Court proceeds to the second step of the analysis, which requires it to "assess the interests each state has in applying its own law and determine which state has the most significant relationship to the parties and the event." <u>Id.</u>; <u>see also</u> <u>O'Connor</u>, 255 N.J. Super. at 548.

The Court finds no conflict between New Jersey's and New York's laws governing the liability of commercial proprietors and event sponsors for injuries suffered by invitees on their premises, and will accordingly apply New Jersey law to Plaintiffs' claims against GLM and Freeman.  <u>Lebegern</u>, 471 F.3d at 428.  In both jurisdictions, "[p]roof of negligence requires, of course, establishment of a duty of care and breach thereof proximately causing the harm." <u>Ivins v. Town Tavern</u>, 335 N.J. Super. 188, 194 (App. Div. 2000); <u>see also</u> <u>Akins v. Glens Falls City School Dist.</u>, 53 N.Y.2d 325, 333 (1981).  The common law on premises liability in both jurisdictions has likewise "undergone [a] transition toward a broadening application of a general tort obligation to exercise reasonable care against foreseeable harm to others," moving away from traditional common law classifications.  <u>Sussman v. Mermer</u>, 373 N.J. Super. 501, 505

12

(App. Div. 2004) (internal quotations and citations omitted); <u>see</u> <u>also</u> <u>Basso v. Miller</u>, 40 N.Y.2d 233, 241 (1976).  Proprietors of commercial spaces in New Jersey and New York are required to "discover and eliminate dangerous conditions, to maintain the premises in safe condition, and to avoid creating conditions that would render the premises unsafe."  <u>Nisivoccia v. Glass Gardens,</u> <u>Inc.</u>, 175 N.J. 559, 563 (2003); <u>see also</u> <u>Candelario v. Watervliet</u> <u>Housing Authority</u>, 46 A.D. 3d 1073 (N.Y.A.D. 3d Dept. 2007).  In both jurisdictions, "[a] proprietor generally is not liable for injuries caused by defects of which he had no actual or implied knowledge or notice, and no reasonable opportunity to discover," and "[w]hether a reasonable opportunity to discover a defect existed will depend on both the character and the duration of the defect."  <u>Brown v. Racquet Club of Bricktown</u>, 95 N.J. 280, 291 (1984); <u>see also</u> <u>Gordon v. American Museum of Natural History</u>, 67 N.Y. 2d 836, 837 (1986).  The scope of a proprietor's duty of care is a question of law for the Court to decide.  <u>Ivins</u>, 335 N.J. Super. at 194; <u>Vogel v. West Mountain Corp.</u>, 97 A.D. 2d 46, 48 (N.Y.A.D. 3d Dept. 1983).

New Jersey and New York have likewise adopted similar approaches to the scope of an event sponsor's duty of care to protect invitees from dangers on the property it has leased for the event.  As a general matter, a sponsor-lessee, like any commercial proprietor, owes to third-party invitees "a duty to

13

use ordinary care to have the premises in a reasonably safe condition." O'Connell v. New Jersey Sports and Exposition Authority, 337 N.J. Super. 122, 128 (App. Div. 2001); Golonka v. Saratoga Teen and Recreation of Saratoga Springs Inc., 249 A.D. 2d 854, 855 (N.Y.A.D. 3d Dept. 1998).  Courts in both jurisdictions, however, have distinguished between the duties of active and passive event sponsors.  Where it has been established that an event sponsor "had such degree of control [over the event] that [it] could have averted the danger, or such superior knowledge that [it] should have foreseen and given warning of a danger not apparent to the plaintiff," such an active sponsor may be held liable for injuries suffered by invitees at the event. Bango v. Carteret Lions Club, 12 N.J. Super. 52, 55 (App. Div. 1951); see also O'Connell, 337 N.J. Super. at 129-30; Vogel, 97 A.D. 2d at 48.  By contrast, in cases where "the defendant sponsors could not have exercised any authority or control over the conduct" at the event, the sponsors' liability for attendees' injuries has been held not to attach.  O'Connell, 337 N.J. Super. at 130; Vogel, 97 A.D. 2d at 48.

Finding no conflict between New Jersey's and New York's laws governing Plaintiffs' claims against GLM and Freeman,[6] the Court

---

[6] As Plaintiffs concede, Mrs. Walters' loss of consortium claim "is a derivative claim that depends [on] the existence of [her husband's] cause of action."  Toscano v. Borough of Lavallette, No. 04-4412, 2006 WL 1867197, at *10 (D.N.J. June 30, 2006).  This is the law in both New Jersey and New York.  See

need not determine which state has a greater interest in applying its law to Plaintiffs' claims.  The Court will apply New Jersey law to assess GLM's and Freeman's motion for summary judgment as to Plaintiffs' tort claims.  <u>Lebegern</u>, 471 F.3d at 428.

        2.   <u>Application to Plaintiffs' Claims</u>

           a.   <u>Premises Liability</u>

Mr. Walters' claim against GLM and Freeman is rooted in the above-described doctrine of premises liability, and is premised on the well-settled principle that a commercial proprietor who invites others onto its property must exercise reasonable care in protecting invitees from dangers on the property.  As an initial matter, the Court finds that while GLM, as the sponsor and organizer of the NYHTS, had a duty to ensure that the Javits Center was reasonably safe for visitors attending the show, Freeman's role as GLM's service contractor did not carry with it a concomitant responsibility to provide for the general safety of the premises.

With regard to GLM, the evidence in the record indicates that it was not merely a passive, in-name-only sponsor of the NYHTS, but was instead the chief organizer of the show with the capacity and responsibility to ensure that the premises at the Javits Center, including the aisles occupied by exhibitors, were safe for visitors.  <u>See</u> <u>O'Connell</u>, 337 N.J. Super. at 129-30;

_____

<u>Liff v. Schildkrout</u>, 49 N.Y. 2d 622, 632 (1980).

see also Bango, 12 N.J. Super. at 55 (sponsor's "duty extends to protection against the acts of third persons if he ought reasonably to have anticipated the occurrence").  GLM organized the show, leased the space at the Javits Center from the NYCCOC, and promoted the show to potential attendees.  (Def. Freeman's Br. Ex. 1; Pls.' Opp'n Br. Ex. 11); see also O'Connell, 337 N.J. Super. at 128 (lessee has "a duty to use ordinary care to have the premises in a reasonably safe condition").  Unlike the event sponsors in Bango and Vogel, which were unable to exercise authority or control over the participants in their respective sponsored events, GLM sold vendor space at the show to exhibitors and had a hands-on presence at the event, with staff "walk[ing] up and down the aisles" during the show, (Pls.' Opp'n Br. Ex. 14), and personnel available to address problems as they arose during the event.  (Pls.' Opp'n Br. Ex. 13.)  As the lessee of the Javits Center on the date of Mr. Walters' injury, the organizer of the NYHTS, and the entity with the capacity to provide for the safety of the show's attendees, GLM had a duty "to use ordinary care to have the premises in a reasonably safe condition."  O'Connell, 337 N.J. Super. at 128.

By contrast, Freeman, as GLM's service contractor, was neither the proprietor or lessor of the premises, nor the sponsor of the NYHTS, and so Mr. Walters' claim against it based on its failure "to maintain the premises in a safe condition for the

public," will be dismissed.[7]   (Am. Compl. ¶ 6.)  In arguing that

Freeman had a duty to provide for the safety of the premises at

the NYHTS, Plaintiffs observe that Freeman was GLM's service

contractor, that it served as the conduit between NYCCOC laborers

and exhibitors and billed F&P for the NYCCOC laborers' work, that

it unloaded exhibitors' materials and moved freight materials

into the Javits Center, and that it helped GLM design the floor

plan for the show.  While all of these observations may be

factually accurate, they do not suggest that Freeman's role at

the NYHTS was that of a proprietor, a sponsor, a tenant, or a

lessee such that Freeman had, as GLM did, a general duty to

provide for the safety of the premises at the show.  O'Connell,

337 N.J. Super. at 128.  In other words, although proprietors

_____

[7]  The Court must emphasize that the discussion herein
concerns only the claim of premises liability of Freeman, and not
a claim for negligent construction of F&P's display booth.  In
their opposition brief, Plaintiffs' arguments regarding Freeman's
liability center exclusively on Freeman's duty to maintain the
safety of the premises at the NYHTS as a whole, not on Freeman's
responsibility for the faulty construction of F&P's booth.  The
Court notes that even if Plaintiffs had advanced an argument
based on the latter theory of liability, Freeman, as the
"conduit" between NYCCOC's laborers and the exhibitors, (Def.
Freeman's Br. Ex. 15 27), is not vicariously liable for the
negligence of the NYCCOC's employees.  See Raimo v. Fischer, 372
N.J. Super. 448, 458 (App. Div. 2004) (citing cases holding that
"a general contractor . . . is not vicariously liable for the
negligence of one of its subcontractors").  There is likewise no
claim that Freeman was negligent in supplying laborers that it
knew or reasonably should have known were incompetent for
construction of the booth.  Plaintiffs have voluntarily dismissed
from this case the laborers' actual employer, NYCCOC, against
which a more plausible argument for vicarious liability might
have been advanced [Docket Item 23].

such as business owners and event sponsors "owe to invitees a duty of reasonable or due care to provide a safe environment for doing that which is within the scope of the invitation," <u>Nisivoccia</u>, 175 N.J. at 563, Freeman, as GLM's contractor, made no such invitation to Plaintiffs and is not subject to such a sweeping duty.  Freeman did not lease the Javits Center, sponsor the trade show, or assume the degree of control over the event cited by the courts in <u>O'Connell</u>, <u>Bango</u> and <u>Vogel</u> as being dispositive of the question of liability in similar contexts.

Had Plaintiffs alleged that Freeman was negligent in unloading exhibitors' materials, or in moving these materials into the Javits Center, or in supplying laborers that it knew or reasonably should have known were incompetent to construct the booth, or that the floor plan of the show had been negligently designed, then the facts cited by Plaintiffs would obviously be relevant to the analysis of their claims, because Freeman clearly had a responsibility to perform all of those functions in a non-negligent fashion.  Plaintiffs have not, however, alleged that Freeman negligently performed any of the specific duties for which it was responsible, but have instead sought to hold Freeman responsible for the safety of the premises as a whole, a duty that Freeman did not, as GLM's contractor, assume.  Finding no basis to impose upon Freeman a general duty to provide for the safety of the premises at the NYHTS, and in the absence of any

evidence that Freeman was negligent in performing any of the duties for which it was responsible, the Court grants Freeman's motion for summary judgment as to Plaintiffs' claims.[8]

                   b.   GLM's Notice of the Dangerous Condition

Although GLM had a duty to exercise due care in keeping the Javits Center in a reasonably safe condition during the NYHTS, it argues that it cannot be held liable for Mr. Walters' injury because the evidence in the case is insufficient to show the existence of a material question of fact as to whether it had actual or constructive notice of the alleged defect that precipitated the accident.  The Court agrees and will grant GLM's motion for summary judgment as to Plaintiffs' claims.

As the Court recognized, supra, "[a] proprietor generally is not liable for injuries caused by defects of which he had no actual or implied knowledge or notice, and no reasonable opportunity to discover." Brown, 95 N.J. at 291.  As the New Jersey Supreme Court explained in Brown,

---

[8] As the Court observed in note 6, supra, Mrs. Walters' loss of consortium claim is a derivative claim that depends upon the existence of Mr. Walters' cause of action.  Having determined that Freeman is entitled to summary judgment on Mr. Walters' claim, the Court must likewise dismiss Mrs. Walters' claim against Freeman.  Additionally, as Freeman argues, the Court's conclusion that Freeman is not liable for Plaintiffs' injuries necessarily means that F&P's and GLM's common law claims for contribution and indemnity must fail, and accordingly, Freeman's motion as to those claims will be granted.

> [w]hether a reasonable opportunity to discover a defect
> existed will depend on both the character and the
> duration of the defect.  Thus, proprietors have been
> absolved of liability where a defective condition was
> found not to be discoverable by reasonable inspection, or
> where a latent defect, undiscoverable except by
> extraordinary investigation, caused an injury shortly
> after a new owner bought a building.

Id. (internal citations omitted).  The duty to inspect thus does

not make a proprietor strictly liable for all latent defects on

its property that it fails to discover, but instead imposes "the

obligation of making a reasonable inspection to discover

dangerous conditions."  Olivo v. Owens-Illinois, Inc., 186 N.J.

394, 406 (2006) (emphasis added).

    In this case, there is no evidence in the record suggesting

that the metal trim that allegedly caused Mr. Walters to fall was

protruding or otherwise noticeably loose prior to the accident,

and in fact, the undisputed evidence is to the contrary.  Neither

Plaintiff testified to having observed that the metal trim was

loose before Mr. Walters fell.  (Def. Freeman's Br. Ex. 16 at 27;

Def. GLM's Br. Ex. C at 97.)  The undisputed testimony of Heather

David, an F&P employee who witnessed Mr. Walters' fall and

observed the state of the booth before and after the accident, is

that "[b]efore he fell[, the metal trim] was flush, it was not

dislodged."  (Def. Freeman's Br. Ex. 12 at 33.)  Ms. David

further testified that she was "quite sure that [the trim] was

not dislodged before" Mr. Walters' accident.  (Id. at 34.)  In

short, the evidence in the record shows that the dangerous

20

condition which Plaintiffs allege caused Mr. Walters' accident was not apparent prior to the accident.

Recognizing the absence of evidence concerning the conspicuousness of the allegedly loose metal trim prior to Mr. Walters' accident, Plaintiffs argue that Mrs. Walters' testimony concerning her inability to find two screws that were allegedly missing from the metal trim on the bottom of the F&P booth creates a triable question of fact as to whether GLM should have been on notice about the dangerous condition prior to the accident.  (Pls.' Opp'n Br. Ex. 6 at 37-38.)  Even giving Plaintiffs the benefit of "all justifiable inferences," Liberty Lobby, 477 U.S. at 255, and thus assuming that the screws were missing before the accident, rather than being dislodged by Mr. Walters' fall, the Court concludes that no reasonable jury could find, based on the evidence in the record, that GLM had actual or constructive notice of the two missing screws.  See Francisco v. Miller, 14 N.J. Super. 290, 298 (App. Div. 1951) (recognizing that "in some cases the question of whether the undisputed period of time sufficed to constitute a reasonable opportunity for the owner or occupier to have inspected and remedied the dangerous condition is properly to be determined by the court").

First, there is no evidence that anyone had actual notice of the missing screws prior to Mr. Walters' accident.  Additionally, the "character . . . of the defect" simply would not give a

21

proprietor a "reasonable opportunity" to discover it such that GLM could be said to have constructive knowledge of the missing screws.  <u>Brown</u>, 95 N.J. at 291.  The alleged defect was in a portion of the F&P booth just inches off of the floor.  (Def. GLM's Br. Ex. C at 34.)  As was the case in <u>Francisco v. Miller</u>, the absence of two screws at the bottom of the F&P booth was an "obscure" defect, 14 N.J. Super. at 297, "undiscoverable except by extraordinary investigation."[9]  <u>Brown</u>, 95 N.J. at 291.  The molding at all times appeared to be flush, so no displacement existed to reveal that the molding was not fully attached by the missing screws.  Moreover, the "duration of the defect," <u>id.</u> – in this case, at most the two days between the construction of the booth and Mr. Walters' accident – indicates that the absence of constructive notice is even clearer here than was the case in <u>Francisco</u>, where the defective condition developed over a "lengthy period of time."  14 N.J. Super. at 298.  Even if two days was ample time to inspect for defective conditions, the defect at issue here would not be discovered.  For a temporary exhibit at which numerous patrons are expected in a short time, the sponsor must promptly and reasonably inspect the premises even before patrons are admitted; the temporary and <u>ad</u> <u>hoc</u> nature

---

[9]  Indeed, Ms. David inspected F&P's booth throughout the day and never noticed that the two screws were missing.  (Def. Freeman's Br. Ex. 12 51.)  Her testimony on this matter is uncontradicted by any of Plaintiffs' evidence.

of the construction of display booths requires no less.  The problem, however, is that no reasonable jury could find that these missing screws should have been evident in any reasonably thorough inspection, because they were essentially at floor level and the metal strip they were supposed to secure appeared to be in place.

In short, the evidence in the record is that the metal trim on the F&P booth was not noticeably defective prior to Mr. Walters' accident, and that the only conceivably ascertainable indicator of the allegedly defective condition prior to the accident was the absence of two screws at the base of the booth. This obscure condition is not the sort of defect "discoverable by reasonable inspection" such that GLM can reasonably be found to have had constructive knowledge of the condition.  Id.; see also Francisco, 14 N.J. Super. at 297.  In light of the absence of evidence suggesting that GLM had actual or constructive knowledge of the allegedly defective condition, the Court must grant its motion for summary judgment as to Plaintiffs' claims.[10]

**D.   The Freeman-Fruits & Passion Indemnity Agreement**

The Court next addresses Freeman's motion for a summary determination that F&P is obligated, under the terms of the parties' indemnification agreement, to defray Freeman's legal

---

[10]  As Plaintiffs concede, the dismissal of Mr. Walters' claim necessarily requires that Mrs. Walters' claim for loss of consortium against GLM be dismissed as well.  See note 8, supra.

fees and expenses in defending this matter.  That agreement provides:

> [F&P] agrees to indemnify, hold harmless, and defend [Freeman] from and against any and all demands, claims, causes of action, fines, penalties, damages, liabilities, judgment, and expenses (including but not limited to reasonable attorneys' fees and investigation costs) for bodily injury, including any injury to [Freeman] employees, and/or property damage arising out of work performed by labor provided by [Freeman] but supervised by [F&P].

(Def. Freeman's Br. Ex. 3 at 2.)  Freeman argues that there is no factual dispute in this case that the NYCCOC labor was "provided by [Freeman] but supervised by [F&P]," (id.), that Plaintiffs' claim arose out of alleged defects in the work performed by the NYCCOC laborers, and that Freeman has incurred legal fees and expenses as a result of having to defend itself in this matter, thereby entitling it to have F&P defray its expenses under the parties' indemnity agreement.

F&P advances two arguments in opposition to Freeman's claim for a summary determination as to the enforcement of the indemnity agreement.  First, F&P argues that the indemnity clause is void and unenforceable under New York General Obligation Law § 5-322.1, which makes unenforceable, inter alia, construction industry contracts purporting to indemnify the promisee from liability for damages resulting from its own negligence.  NY Gen.

Oblig. § 5-322.1.[11]   Second, F&P argues that factual issues exist
as to whether Freeman itself was negligent, thereby requiring
that Freeman's motion be denied.

The Court will grant Freeman's motion for summary judgment
on its claim against F&P.  As an initial matter, the Court agrees
with F&P's assertion, not contested by Freeman, that New York law
governs the construction of the Freeman-F&P contract.  Under New
Jersey law, which the Court must apply to determine which state's
laws govern its analysis of the contract in question, Berg
Chilling Systems, Inc., 435 F.3d at 462, "the law of the place of

---

[11]   New York General Obligation Law § 5-322.1 provides in
relevant part:

> A covenant, promise, agreement or understanding in, or in
> connection with or collateral to a contract or agreement
> relative to the construction, alteration, repair or
> maintenance of a building, structure, appurtenances and
> appliances including moving, demolition and excavating
> connected therewith, purporting to indemnify or hold
> harmless the promisee against liability for damage
> arising out of bodily injury to persons or damage to
> property contributed to, caused by or resulting from the
> negligence of the promisee, his agents or employees, or
> indemnitee, whether such negligence be in whole or in
> part, is against public policy and is void and
> unenforceable; provided that this section shall not
> affect the validity of any insurance contract, workers'
> compensation agreement or other agreement issued by an
> admitted insurer. This subdivision shall not preclude a
> promisee requiring indemnification for damages arising
> out of bodily injury to persons or damage to property
> caused by or resulting from the negligence of a party
> other than the promisee, whether or not the promisor is
> partially negligent.

NY Gen. Oblig. § 5-322.1(1).

contracting should ordinarily be applied unless some other state has the dominant relationship with the parties and issues." NL Industries, Inc. v. Commercial Union Ins. Co., 65 F.3d 314, 319 (3d Cir. 1995) (internal quotations omitted).  In this case, New York was not only the place of contracting, but New York has a greater relationship with the indemnification issues in the case than New Jersey (or any other state), since the performance of the contract and the events underlying this litigation occurred in New York.  Id.  The Court accordingly finds that the construction of the Freeman-F&P contract is governed by New York law.

Plaintiffs' claim plainly falls within the broad language of the indemnity provision.  The agreement requires F&P to indemnify Freeman against all claims and expenses "(including but not limited to reasonable attorneys' fees and investigation costs) for bodily injury . . . arising out of work performed by labor provided by [Freeman] but supervised by [F&P]."  (Def. Freeman's Br. Ex. 3 at 2.)  F&P's contractual obligation to indemnify and defend Freeman extends to any claim for bodily injury arising out of F&P-supervised construction performed by the NYCCOC laborers.  Noticeably absent from the indemnity clause is a requirement that a claimant establish that F&P or the NYCCOC's laborers were indeed negligent before F&P's obligation to indemnify Freeman arises.  In this case, Plaintiffs' claims manifestly "aris[e] out

26

of" work performed by the NYCCOC's laborers and supervised by F&P, since the purportedly dangerous condition that Plaintiffs allege caused Mr. Walters to fall was an alleged defect in the booth designed by F&P, (Def. GLM's Br. Ex. J at 14), constructed by NYCCOC laborers provided by Freeman, (Def. Freeman's Br. Ex. 12 17), under the supervision of F&P's agents.[12]   (Def. Freeman's Br. Ex. 15 at 32.)

F&P's reliance upon New York General Obligation Law § 5-322.1 is unavailing.  Section 5-322.1 "only prohibits enforcement of a contractual indemnification clause if the party seeking indemnification was negligent or had the authority to supervise, direct, or control the manner of the work that caused the injury."  Damiani v. Federated Dept. Stores, Inc., 23 A.D. 3d 329, 331 (N.Y.A.D. 3d Dept. 2005) (internal citations omitted). F&P has identified no evidence from which a jury could find that Freeman was negligent, but instead posits a variety of hypothetical scenarios – none supported or even suggested by the evidence before the Court – in which a jury conceivably could find that Freeman acted negligently.  These suppositions are

---

[12]   It bears noting that F&P could have elected to have Freeman supervise the construction of its booth, in which case, under the parties' contract, Freeman would have been required to indemnify F&P for injuries arising out of the work performed by the NYCCOC's laborers under essentially the same terms.  (Def. Freeman's Br. Ex. 3 2.)  F&P chose instead to supervise the work itself, thereby contractually electing to indemnify Freeman for claims arising out of the work.

insufficient to raise a genuine issue of material fact as to Freeman's negligence.[13]   See Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986) (a party opposing summary judgment "must do more than simply show that there is some metaphysical doubt as to the material facts").  And, of course, under the terms of the Freeman-F&P agreement, Freeman did not "ha[ve] the authority to supervise, direct, or control the manner of the work that [allegedly] caused the injury."  Damiani, 23 A.D. 3d at 331.  To the contrary, F&P expressly assumed such supervisory responsibilities itself.  (Def. Freeman's Br. Ex. 3 at 2.)

Finding that the Walters' claims fall within the broad terms of the Freeman-F&P indemnity clause, and finding that New York General Obligation Law § 5-322.1 does not prohibit the enforcement of the clause as it applies to the facts of this case, the Court will grant Freeman's motion for summary judgment as to its claim for indemnity from F&P under the terms of the parties' contract.

---

[13]  As the Court explained in Note 7, supra, because "a general contractor . . . is not vicariously liable for the negligence of one of its subcontractors," Raimo, 372 N.J. Super. at 458, Freeman would not be vicariously liable for the negligence of the NYCCOC laborers, even if there were evidence of such negligence in the record.

### E.    The GLM-Freeman Contract

Finally, the Court addresses GLM's and Freeman's cross-motions for summary judgment as to GLM's contractual claims against Freeman.[14]  First, Freeman argues that it is entitled to summary judgment on GLM's cross-claim, contained in Count Four of GLM's Answer to Plaintiffs' Amended Complaint [Docket Item 20], that Freeman breached the provision of the parties' contract requiring Freeman to "carry commercial general liability insurance . . . nam[ing GLM] as additional insured."  (Def. GLM's Br. Ex. E.)  Freeman draws the Court's attention to its Certificate of Liability Insurance, which states that from April 1, 2005 to April 1, 2006, Freeman was covered by a policy that included general commercial liability, automobile liability, and workers' compensation insurance and that named GLM as an "additional insured."  (Def. Freeman's Br. Ex. 10.)  According to Freeman, the undisputed evidence that it purchased the insurance policy in question suffices to establish its compliance with its contractual obligation to carry such insurance.[15]

---

[14]   For the reasons explained in the Court's discussion of the Freeman-F&P contract, _supra_, the Court agrees with the parties that "the law of the place of contracting" – in this case, New York – also governs its analysis of the GLM-Freeman contract.  _NL Industries, Inc._, 65 F.3d at 319.

[15]   The GLM-Freeman insurance clause provides that

[Freeman] will carry commercial general liability insurance, including auto liability and workers' compensation insurance to protect itself from any claims

29

As Freeman notes in its Reply Brief, GLM has neither addressed nor submitted evidence to challenge Freeman's claim that by purchasing the insurance policy evidenced in the record, it has complied with its obligations under the insurance provision of its contract with GLM.  The undisputed evidence in the record shows that Freeman did purchase an insurance policy, and that on its face the policy appears to comply with all of the requirements contained in the insurance clause of the parties' contract.  The Certificate of Liability Insurance includes a policy for commercial general liability insurance, automobile liability, and workers' compensation insurance, and names GLM as an additional insured, exactly as is specified in the parties' contract.  (Def. Freeman's Br. Ex. 10; Def. GLM's Br. Ex. E.)  In light of this evidence of Freeman's performance of its contractual obligation, and the absence of evidence suggesting that the policy somehow does not conform with the requirements described in the parties' contract, the Court will grant Freeman's motion for summary judgment as to GLM's cross-claim for breach of the insurance provision of the parties' contract.  See

---

arising  from  its  operations  on  behalf  of  [GLM], immediately  prior  to,  during  and  immediately  following the [NYHTS].  Such commercial general liability insurance shall name [GLM] as additional insured with respect to such coverage and shall be primary and noncontributory to any insurance carried by [GLM] which shall be in excess to the Freeman insurance.

(Def. GLM's Br. Ex. E.)

Walls v. Turner Const. Co., 10 A.D. 3d 261, 262 (N.Y.A.D. 1st
Dept. 2004) (noting that the defendant "present[ed] evidence in
the form of a certificate demonstrating that it had, in fact,
complied with its contractual obligation to procure insurance on
Turner's behalf").

Finally, GLM argues that under the terms of the indemnity
clause in the GLM-Freeman contract, if GLM's motion for summary
judgment on Plaintiffs' claims is denied "and this matter
proceeds to a jury as to GLM, GLM is entitled to defense costs
and indemnification from Freeman."  (Def. GLM's Opp'n Br. 3.)
Because the Court has found, supra, that GLM is entitled to
summary judgment as to Plaintiffs' claims, it will dismiss as
moot GLM's contractual claim for indemnity against Freeman.

**III. CONCLUSION**

For the reasons explained above, the Court will grant
Freeman's and GLM's motions for summary judgment as to
Plaintiffs' negligence claims.  The Court will also grant
Freeman's motion for summary judgment as to its contractual claim
for indemnity from F&P.  Finally, the Court will grant Freeman's
motion for summary judgment as to GLM's cross-claim to enforce
the insurance provision of the parties' contract, and will

31

dismiss as moot GLM's claim for contractual indemnity from

Freeman.  The accompanying Order will be entered.


**March 4, 2008**                          **s/ Jerome B. Simandle**
Date                                       JEROME B. SIMANDLE
                                           United States District Judge